LOPER. The (PICKELL v.). See Case No. 11,119.

## Case No. 8,500.

### LORAINE v. CARTWRIGHT.

[3 Wash. C. C. 151.] [1]

Circuit Court, D. Pennsylvania. April Term, 1812.

**AGENT—ORDERS — ACCEPTANCE OF CONSIGNMENT —SHIPPER'S TERMS—RATIFICATION OF UNAUTHORIZED ACTS.**

1. This court has always deemed it proper to hold agents to a strict account, in relation to the orders they receive, provided they are expressed in plain terms. and free from ambiguity: and in this respect the same measure of justice has been

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington. Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr., Esq.]

dealt out to agents within the United States, acting for persons abroad, as to the foreign agents of citizens of the United States.

[Cited in Very v. Levy, 13 How. (54 U. S.) 359.]

2. Where an agent abroad, is directed not to sell for less than the first cost and charges, and an invoice accompanies the letter, stating the prices of the articles, and the amount of the charges on the shipments, the price stated in the invoice is the maximum by which the agent is to be governed. He has nothing to do with the actual cost of the articles.

3. If a consignee accepts a consignment, he does it on the terms prescribed by the shipper; he might have rejected it, but he cannot, after accepting it, refuse a compliance with the orders which accompanied it.

4. Quere, what will amount to a ratification of the unauthorized acts of an agent?

[Cited in Perkins v. Currier. Case No. 10,985; Clark v. Manufacturers' Ins. Co., 8 How. (49 U. S.) 246; Le Roy v. Beard, Id. 468.]

[Cited in brief in Yeatman v. Corder, 38 Mo. 339.]

In May, 1809, the plaintiff was encouraged by Mr. Sheepshanks of Philadelphia, the agent of Bainbridge and Cartwright of Liverpool, to ship them a large parcel of cotton, on consignment; and at the same time, drew on them, by way of advance, a bill for £1000 sterling, (which was much less than the usual advance,) which bill was endorsed by Sheepshanks, and was duly accepted, the day before the house in England knew of the intended shipment of the plaintiff. The day after acceptance, the vessel with the cotton arrived at Liverpool, bringing a letter from the plaintiff, in which he expressed the sanguine expectations he had formed of obtaining a high price for this parcel of cotton, and his confidence in the judgment of the consignees, Bainbridge and Cartwright. The letter enclosed the invoice of the cotton, priced at 20 cents per pound, besides the charges; and the plaintiff, after stating that he always wishes to give his agents the greatest possible latitude in his power, as they must be the best judges of the present and future probable prices, adds, that "they are to sell on arrival, provided the price should be such as to cover first cost and charges." Sheepshanks, at the same time, wrote to Bainbridge and Cartwright, informing them of the shipment, of the plaintiff's bill on them, and that the policy of insurance on the cargo, to the amount of more than 10,000 dollars, was lodged with him for security. On the day that the cargo arrived at Liverpool, Bainbridge and Cartwright wrote to the plaintiff, that they had accepted his bill before they knew of the shipment, and that they should run off a small part of the cotton the same day. In fact, they disposed of the whole cargo in a day or two after its arrival, at the highest market price at that time, though much below the invoice enclosed to them; and though there were at the time strong appearances that this article would decline in price, the unexpected disavowal of Erskine's treaty, and

the renewal of the non-intercourse, by the United States, produced a sudden change, and cotton rose to a high price soon after the sale of this cargo. Bainbridge and Cartwright informed the plaintiff of this sale soon after it was made, and forwarded the account of sales to him, stating a balance in favour of the plaintiff. In answer to these letters, the plaintiff, on the 6th of October, 1809, wrote to Bainbridge and Cartwright, that being then in a hurry, he could only acknowledge the receipt of their letter, but that he would in his next, write to them more fully. That he had drawn on them for £430, and in his next would give directions as to the application of the balance in their hands. On the 6th of November following, the defendant, Cartwright, being in Philadelphia, the plaintiff wrote to him, that he should bring suit to recover compensation for the breach of his orders. The defendant proved, that though the invoice enclosed by the plaintiff to Bainbridge and Cartwright, rated the cotton at 20, yet in fact, it cost him only 18 cents, and that that was the market price at Philadelphia when this shipment was made.

It was contended, by Mr. Ingersoll, for defendant—1. That the words first cost, meant the market price, and not the invoice price. 2. That let the plaintiff's orders be construed how they might, still, Bainbridge and Cartwright had a right to sell, at least to the amount of the bill drawn upon them; although the price should be less than they were ordered to take. 3. That the plaintiff's letter of the 6th of October, and the bill which that letter announces he had drawn, is a complete affirmance of the conduct of Bainbridge and Cartwright, and a waiver of any demand against them for breach of orders.

WASHINGTON, Circuit Justice (charging jury). This court has always thought it right to hold agents to a strict account, in relation to the orders they receive, provided they are expressed in terms, plain and free from ambiguity; and in this respect, the same measure of justice has been dealt out to agents within the United States, acting for persons abroad, as to the foreign agents of citizens of the United States.

The first inquiry is, what is the meaning of the terms used in the letter of the plaintiff, in relation to the sale of this cargo? Prime or first cost, is in itself somewhat equivocal, as it may mean the price at which it was purchased, or the market price at the time it was shipped, or the invoice price, which is generally understood to correspond with the market price, although frequently this is not the case. But, when an agent abroad, is directed not to sell for less than the first cost and charges, and an invoice accompanies the letter, pricing the articles and stating the amount of the charges on the shipment, nothing can be

more clear, than that the sum stated in the invoice, is the minimum by which the agent is to be governed. As to the actual cost of the articles, it is almost impossible that the agent should know any thing about it, and very improbable that he should know even the real market price, at the place of shipment; and it is not to be supposed, that the principal could intend to refer his agent to an uncertain standard, when the order carries with it one which is certain. The goods may have cost the shipper much more than they are really worth at the time of shipping, or much less; and of course, the invoice price, more especially when it is referred to, as in this case it was, as fixing the sum for which the insurance was effected, fixes the only rational standard, by which the agent can and ought to be governed.

2. The plaintiff's bill did not authorize a breach of his orders, either in whole, or so far as to cover that bill. It was accepted before the defendant had notice of the shipment, upon the credit of the drawer and endorser; and even if it had been accepted afterwards, yet in either case, Bainbridge and Cartwright, if they accepted the consignment at all, it could only be upon the terms prescribed by the shipper. They might have refused to accept in the first instance, for want of advice or of funds; and might have done so even after the cargo was received, upon the ground, that they were restricted by the orders from selling, so as certainly to furnish funds for taking up the bill when it should become due. But it is entirely inadmissible for the defendant, to make their voluntary acceptance of the plaintiff's bill, an excuse for a breach of his orders.

3. There is no doubt, but that a principal may ratify the act of one who has acted in his behalf, as his agent, though without authority, or who has transcended his powers; and in this way give validity to the act, as if it had been strictly authorized in the first instance. This ratification may take place, not only directly, but by collateral acts; as if the principal, knowing all circumstances, sue for, accept, or even demand the payment of the purchase money, in this way indicating his willingness to affirm the sale. But in this case, the plaintiff did not demand the amount of sales, or even intimate that he would be satisfied to receive them. He drew for £430, which he had certainly a right to do, and informed Bainbridge and Cartwright, that he shall, in a subsequent letter, write more fully to them, and will then give directions as to the application of the balance in their hands; so that he reserves the right of deciding as to his future conduct, until the time when he should write again. It is possible, that the plaintiff wished to obtain further information as to the circumstances under which the sale of his cotton had taken place, and at the moment, might even have inclined to submit to what had been done. But his letter of the 6th of October, certainly did not commit him so far, as to prevent his subsequent refusal to sanction the sale which had been made. Accordingly, in his next letter, dated the 6th of November, he informs the defendant that he shall bring suit, to recover a compensation for the damages he had sustained by the breach of his orders. What those damages should be, you, gentlemen, must decide.

Verdict for upwards of 3000 dollars.